## Case No. 5,164.

### FUTTERER v. ABENHEIM.

[31 Leg. Int. 133; [1] 10 Phila. 225; 6 Leg. Gaz. 116.]

Circuit Court, E. D. Pennsylvania. April 6, 1874.

J. Warren Coulston, for libellants.
Morton P. Henry, for respondent.

McKENNAN, Circuit Judge. The charter party in this case provided for a voyage from an indefinite port in England to Philadelphia, and for the discharge of the cargo at a wharf to be directed by the consignee on the arrival of the vessel. It was also stipulated, that fifteen days should be allowed the charterers for loading the vessel (if she was not sooner dispatched), "and the ship to be discharged as fast as the custom of the port will admit, and ten days on demurrage over and above the said days, at seven pounds per day." The vessel reached Philadelphia on the 13th of September, 1871, when she was ordered to discharge her cargo at Willow street wharf. She accordingly proceeded to that wharf on the 19th of September, where she remained until October 9th, before she could begin the discharge of her cargo, on account of the pre occupancy of the wharf by other vessels. For the detention thus caused, the libellant claims the stipulated demurrage and damages in the nature of demurrage.

In view of numerous decisions of the English and American courts, and of the evident justness of the rule, it must be taken as now settled, that where a vessel is required to load or discharge her cargo at a particular dock, and she is there detained by reason of its crowded condition, the delay must be compensated by the charterer. The ship owner has done all that he was required to do when he has taken his ship to the appointed place of discharge. It is implied in his contract, that he shall then not be subjected to any delay, which is not necessary,

[1] [Reprinted from 31 Leg. Int. 133, by permission.]

to unload his vessel. Detention of the vessel for any other reason, may justly be regarded as the fault of the charterer, because she is placed in the circumstances, by which it is caused, by his act, without right on the part of the owner to escape from them. He is, therefore, rightly held accountable for the consequent loss to the owner.

In Randall v. Lynch, 2 Camp. 352, the ship was in the London docks, to which she was destined by her charter party, and could not be unladen within the stipulated time, by reason of the crowded state of the docks, and Lord Ellenborough said: "The question is, whether the detention of the ship, arising from the inability of the London Dock Company to discharge her, is, in point of law, imputable to the freighter; and I am of opinion, that the person who hires a vessel detains her, if at the end of the stipulated time he does not restore her to the owner. He is responsible for all the various vicissitudes which may prevent him from doing so. While the goods remained on board the vessel in the London docks, it was impossible for the plaintiff to make any use of her, and to all intents and purposes she was there detained by the defendant. When she was brought into the docks, all had been done which depended upon the plaintiff, and the dock company were the defendant's agents for her delivery. The defendant is as much responsible for a delay arising from the want of a berth, as if it had arisen from tempestuous weather, or any other cause." In conformity to the rule thus stated, many English and American cases have been decided. Bessey v. Evans, 4 Camp. 131; Barret v. Dutton, Id. 333; Hill v. Idle, Id. 327; Philadelphia & R. R. Co. v. Northam [Case No. 11,090]; Davis v. Wallace [Id. 3,657], per Clifford, J. It is true, that Rodgers v. Forresters, 2 Camp. 483, and Burmester v. Hodgson, Id. 488, are in apparent conflict with these cases. But they were decided upon proof of a custom prevailing at the London docks, with reference to the discharging of the special kind of cargo with which the vessels were laden, and upon the effect under this proof of a stipulation, express or implied, in the charter party, that the freighter should be allowed "the usual and customary time," for unloading the vessels. Beyond this, they have not been followed in England, for, as was said by Boville, Chief Justice, in Topscott v. Balfour, Law Rep. Jan., 1873, pt. 1, 52: "The rule is, that when a port is named in the charter party as the port to which the vessel is to proceed, the lay days do not commence upon the arrival of the vessel in the port, but upon her arrival at the usual place of loading in the port; not the actual berth at which she loads, but the dock or roadstead where loading usually takes place. If, when she arrives there, the place is so crowded that she cannot load, the loss must fall on the charterer." The charter provided for the selec-

tion of the dock by the freighters, and they named the Wellington dock, and the chief justice says further: "Treating the charter, as I have before said it must be treated, viz., as though it provided that the ship should proceed direct to the Wellington dock, then any loss arising from the state of the dock must fall, according to the authorities, on the charterers, and not on the ship owner." He held, however, that delay arising from the exclusion of the vessel from the dock, in pursuance of its established regulations, was not imputable to the charterer, for the reason that the parties must be taken to have known such regulations, and to have made their contract in reference to them. But for detention caused by a fortuitous condition of the dock, which obviously could not have been foreseen or contemplated when the charter was made, the charterer was adjudged to be accountable. And such must be regarded as the rule which is established by the preponderating weight of authority.

The learned counsel for the respondent has, however, argued with great earnestness, that this rule is not applicable in this case, because of the terms of the charter. It contains this clause: "And the ship to be discharged as fast as the custom of the port will admit;" and it is urged that this means that the vessel must await her regular turn for a berth at the wharf appointed for her discharge. As a vessel seeking a berth to unload, has no right to displace another which is in it before her, she must necessarily wait her turn, and as the custom to do this is universal, every charter must be taken as made with reference to it. If the meaning ascribed to the clause then be its true meaning, it only expresses what is implied in every charter. And yet, in the numerous cases referred to, it was held, that the unavoidable observance of the custom did not relieve the charterer from accountability for the consequent loss. But I do not think it is to be so construed. It does not refer to the time when the discharge of the vessel is to be begun, but to the process of discharging her. If there should be any special custom at the port of Philadelphia, by which the unloading of the vessel would be delayed, the charterer was not to be accountable for it. And by this reference to it as a custom of the port of Philadelphia, it is not reasonable to regard it as applicable to a custom which is not peculiar to that port, but of general and universal prevalence. For the loss, therefore, resulting from the condition of the dock, the respondents must, therefore, be held liable. The whole loss, including the stipulated demurrage and damages, is accurately computed at $736.33, in the decree of the district court. [Case unreported.] That decree is therefore affirmed, and a decree will be entered in this court for the sum so adjudged by it against the respondents, with interest from June 7th, 1873, and costs.